## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**AVIANA PUGLIESE**, on behalf of herself and on behalf of all other similarly situated individuals,

    Plaintiff,

v.

**SUMMIT PATHOLOGY** and **SUMMIT PATHOLOGY LABORATORIES, INC.**,

    Defendants.

Case No. _____

**CLASS ACTION**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiff Aviana Pugliese ("Plaintiff"), individually and on behalf of all other similarly situated individuals (the "Class" or "Class Members," as defined below), by and through her undersigned counsel, files this Class Action Complaint against Summit Pathology and Summit Pathology Laboratories, Inc. ("Summit" or "Defendants") and alleges the following based on personal knowledge of facts, upon information and belief, and based on the investigation of her counsel as to all other matters.

### I.  INTRODUCTION

1.  Plaintiff brings this class action lawsuit against Summit for its negligent failure to protect and safeguard Plaintiff's and the Class's highly sensitive personally identifiable information ("PII") and protected health information ("PHI"). As a result of Summit's negligence and insufficient data security, cybercriminals easily infiltrated Defendants' inadequately protected computer systems and **stole** the PII and PHI of Plaintiff

1

and the Class (approximately **1,813,538 individuals**) (the "Data Breach" or "Breach").[1] Now, Plaintiff's and the Class's PII and PHI is in the hands of cybercriminals who will undoubtedly use their PII/PHI for nefarious purposes for the rest of their lives.

2.    According to Summit, on or around April 18, 2024, Summit identified suspicious activity within its computer environment.[2]

3.    After an investigation, Summit identified files within its systems that may have been accessed or acquired by an unauthorized cybercriminal, and the impacted systems contained certain patient data.[3]

4.    The Private Information stolen in the Data Breach included highly sensitive private information such as: names, addresses, medical billing and insurance information, certain medical information such as diagnoses, and demographic information such as dates of birth, Social Security numbers, and financial information. (collectively, "Private Information").[4]

5.    Defendants acquired, collected, and stored Plaintiff's and Class Members' Private Information in connection with the medical services it provided. Therefore, at all relevant times, Defendants knew or should have known that Plaintiff's and Class Member's sensitive data, including their highly confidential Private Information would be stored on Defendants' networks.

6.    By obtaining, collecting, using, and deriving a benefit from Plaintiff's and

---

[1] https://www.hipaajournal.com/summit-pathology-data-breach/.
[2] https://www.summitpathology.com/notice-of-data-breach/.
[3] *Id.*
[4] *Id.*

Class Members' Private Information, Defendants assumed legal and equitable duties to Plaintiff and the Class. These duties arose from state and federal statutes and regulations as well as common law principles.

7.      Defendants disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly and/or negligently failing to take and implement adequate and reasonable measures to ensure that Plaintiff's and Class Members' Private Information was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data and failing to follow applicable, required and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As a result, the Private Information of Plaintiff and Class Members was compromised through disclosure to an unknown and unauthorized third party—an undoubtedly nefarious third party that seeks to profit off this disclosure by defrauding Plaintiff and Class Members in the future.

8.      Due to Summit's negligent failure to secure and protect Plaintiff's and Class Members' Private Information, cybercriminals have stolen and obtained everything they need to commit identity theft and wreak havoc on the financial and personal lives of millions of individuals.

9.      Now, and for the rest of their lives, Plaintiff and the Class Members will have to deal with the danger of identity thieves possessing and misusing their Private Information. Even those Class Members who have yet to experience identity theft will have to spend time responding to the Data Breach and are at an immediate and heightened risk of all manners of identity theft as a direct and proximate result of the Data Breach.

10.     Plaintiff and Class Members have incurred and will continue to incur damages in the form of, among other things, identity theft, attempted identity theft, lost time and expenses mitigating harms, increased risk of harm, damaged credit, diminution of the value of their Private Information, loss of privacy, and additional damages as described below.

11.     Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they are entitled to injunctive and other equitable relief.

12.     Plaintiff brings this action individually and on behalf of the Class, seeking compensatory damages, punitive damages, nominal damages, restitution, injunctive and declaratory relief, reasonable attorneys' fees and costs, and all other remedies this Court deems just and proper.

## II.     THE PARTIES

13.     **Plaintiff Aviana Pugliese** is an individual domiciled in Denver, Colorado. Plaintiff received a Notice of Data Breach Letter from Summit dated October 18, 2024, notifying her that her name, address, medical billing, medical insurance information, medical information (including diagnoses), date of birth, Social Security number, and financial information was compromised in the Data Breach.[5]

14.     Defendant **Summit Pathology** is a general partnership with its primary address located at 5802 Wright Drive, Loveland, Colorado 80538.

15.     Defendant **Summit Pathology Laboratories, Inc.** is a Colorado corporation

---

[5] Ex. 1 (Notice of Data Breach Letter).

with its principal place of business located at 5802 Wright Drive, Loveland, Colorado 80538.

### III.    JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than one hundred putative Class Members, and minimal diversity exists because many putative Class Members are citizens of a different state than Defendants.

17.    Further, federal jurisdiction is proper because Defendants serve patients throughout Colorado, Wyoming, and Nebraska.[6]

18.    This Court has personal jurisdiction over Summit Pathology Laboratories, Inc. because it is a Colorado corporation and has its principal place of business in this District. Further, this Court has personal jurisdiction over Summit Pathology because it is a general partnership with partners in this District. Defendants conduct substantial business in this District through its headquarters, offices, and affiliates, engaged in the conduct at issue here in this District, and/or otherwise have substantial contacts with this District and purposely availed themselves to the Courts in this District.

19.    Venue is proper in this District under 28 U.S.C. §§ 1391(a)(2), 1391(b)(2), and 1391(c)(2) as a substantial part of the events giving rise to the claims emanated from activities within this District.

---

[6] https://www.summitpathology.com/about/.

## IV.    FACTUAL ALLEGATIONS

**A. Defendants' Collection of Plaintiff's and the Class's Private Information.**

20.    According to Summit, "Summit Pathology is an independent pathology laboratory, owned by a practice of twenty two board certified pathologists" and has "been serving hospital systems and physician offices in Colorado, Wyoming, and Nebraska for more than thirty five years."[7]

21.    Summit offers general surgical pathology, breast pathology, cytopathology, hematopathology, gastrointestinal pathology, dermatopathology, transfusion medicine, microbiology, and clinical chemistry.[8]

22.    As part of the medical services Defendants provide, they are entrusted with and obligated to safeguard and protect the Private Information of Plaintiff and the Class in accordance with all applicable laws and industry standards.

23.    Indeed, Defendants made promises and representations to Plaintiff and Class Members that the Private Information it collected from them would be kept safe, confidential, that the privacy of that information would be maintained.

24.    Specifically, Defendants state they "are committed to protecting the privacy of your protected health information" including the "laboratory test orders and test results as well as invoices for the healthcare services we provide." [9]

25.    Defendants also state:

---

[7] *Id.*

[8] *Id.*

[9] https://www.summitpathology.com/wp-content/uploads/2024/07/Notice-of-Privacy-Practices-Rev-7.2024.pdf.

In the event of a breach of your PHI that has not been secured in accordance with federal standards (such as encrypted), you have the right to be notified of the breach and to be provided, to the extent available, with a description of the breach, a description of the types of information involved in the breach, the steps you should take to protect yourself from potential harm, a brief description of what we are doing to investigate the breach, mitigate harm, and prevent further breaches, as well as contact information for questions or concerns regarding the breach.[10]

26.    It is evident Summit recognized it had a duty to keep Plaintiff's and the Class's PII and PHI secure but failed to.

27.    The Data Breach makes it clear that Summit does not take patient confidentiality seriously nor does it follow state or federal law to protect Private Information.

28.    Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their Private Information. Plaintiff and Class Members relied on the sophistication of Defendants to keep their Private Information confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information. Plaintiff and Class Members value the confidentiality of their Private Information and demand security to safeguard their Private Information.

29.    Defendants had a duty to adopt reasonable measures to protect the Private Information of Plaintiff and Class Members from involuntary disclosure to third parties. Defendants have a legal duty to keep patients' Private Information safe and confidential.

30.    Defendants had obligations created by FTC Act, HIPAA, contract, industry

---

[10] *Id.*

standards, and representations made to Plaintiff and Class Members, to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

31.    Defendants derived a substantial economic benefit from collecting Plaintiff's and Class Members' Private Information. Without the required submission of Private Information, Defendants could not perform the medical services they provide and obtain revenue.

32.    By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendants assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' Private Information from disclosure.

33.    However, Defendants failed to take this responsibility seriously and failed to protect Plaintiff's and the Class's Private Information from unauthorized access, resulting in a massive and preventable data breach.

**B. Defendants' Massive and Preventable Data Breach.**

34.    On or around April 18, 2024, Summit detected suspicious activity within its networks.[11]

35.    Afterwards, Summit initiated an investigation and determined that an "files within [its] systems [] may have been accessed or acquired by [an] unauthorized cybercriminal, and the impacted systems contained certain patient data."[12]

36.    Summit did not state how long the criminals had access to Summit's systems

---

[11] https://www.summitpathology.com/notice-of-data-breach/.
[12] *Id.* (emphasis added).

and Plaintiff's and the Class's PII/PHI.

37.    "The impacted systems contained demographic and healthcare information which include names, addresses, medical billing and insurance information, certain medical information such as diagnoses, and demographic information such as dates of birth, Social Security numbers, and financial information."[13]

38.    The Data Breach purportedly "began in April when an employee clicked open a malicious email attachment."[14]

39.    Shortly after the Breach, well-known ransomware group, Medusa, claimed credit for Summit's Data Breach.[15]

40.    It is unknown if Summit paid a ransom demand in connection with the Breach.[16]

41.    The apparent phishing vector suggests that either Summit's email filtering does not have the ability to detect Medusa ransomware, or that the company is not using e-mail filters at all.[17]

42.    Summit sent written notification of the Data Breach ("Notice of Data Breach Letters") in or around October 2024—months after the Breach occurred.[18]

43.    The Notice Letter Summit sent to victims of the Data Breach amounts to no

---

[13] *Id.*
[14] https://www.govinfosecurity.com/medusa-ransomware-hack-pathology-lab-affects-18-million-a-26695.
[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *See* Ex. 1.

real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiff and Class

Members of the Data Breach's critical facts such why the Data Breach when the Data

Breach began, when the Data Breach ended, why it took Summit so long to notify affected

individuals of the Breach, and who the perpetrator of the Data Breach is and if they have

been caught. Without these details, Plaintiff's, and Class Members' ability to mitigate the

harms resulting from the Data Breach is severely diminished.

44.    Furthermore, Defendants inexplicably delayed giving notice of the Data

Breach to Plaintiff and the Class for weeks, giving cybercriminals a head start in misusing

and selling Plaintiff's and the Class's Private Information.

45.    It is clear Summit expects victims of the Data Breach to experience fraud and

identity theft resulting from the Data Breach because Summit states the following on its

website:

> In response to the incident, we are providing affected individuals with access
> to identity theft protection services through IDX, A ZeroFox Company, the
> data breach and recovery services expert. IDX identity protection services
> include credit and CyberScan monitoring / 12 or 24 months of credit and
> CyberScan monitoring, depending on your state of residence], a $1,000,000
> insurance reimbursement policy, and fully managed id theft recovery
> services. With this protection, IDX will help you resolve issues if your
> identity is compromised.[19]

46.    Summit need not provide credit monitoring if Plaintiff and the Class were

not at an imminent risk of fraud and identity theft.

47.    After receiving the Notice Letters, it is reasonable for recipients, including

Plaintiff and Class Members, to believe that the risk of future harm (including identity

---

[19] https://www.summitpathology.com/notice-of-data-breach/.

theft) is substantial and imminent, and that it is necessary for them to take steps to mitigate that substantial risk of impending and future harm.

48.    Defendants' token gesture of credit monitoring services to Plaintiff and the Class is woefully inadequate considering Plaintiff and Class Members will be at a continued risk of fraud and identity theft for the rest of their lives. This gesture does not and will not fully protect Plaintiff and the Class from cybercriminals and is largely ineffective against protecting data after it has been stolen. Cybercriminals are fully aware of the well-publicized preventative measures taken by entities after data breaches such as that which happened here and will, therefore, oftentimes hold onto the stolen data and not use it until after the complimentary service is no longer active, and long after victim concerns and preventative steps have diminished. There would be no need to provide credit monitoring services if Plaintiff and the Class were not at an imminent risk of harm due to the Data Breach.

49.    It is apparent that the unauthorized third-party cybercriminals intentionally targeted and gained access to Plaintiff's and the Class's Private Information with the intent of engaging in misuse of the Private Information, including marketing, and selling Plaintiff's and Class Members' Private Information to fraudsters as that is the *modus operandi* of data thieves.

50.    "A medical testing laboratory is a prime example of a third party that is attacked because it holds sensitive patient information for lots of individual facilities - its

customers."[20]

51.    In fact, Summit admits it did not have proper data security measures in place, because it states the following on its website:

> As part of our ongoing commitment to the privacy of personal information in our care, we reviewed our existing policies and procedures and implemented additional administrative and technical safeguards to help prevent future attacks. We also worked with third-party subject matter specialists to further enhance the security of our systems.[21]

52.    Summit should have implemented these enhanced technical security measures prior to the Data Breach to prevent the Data Breach from occurring.

53.    Summit did not use reasonable security procedures and practices appropriate to protect the sensitive information it was maintaining for Plaintiff and Class Members, such as encrypting the information or deleting it when it is no longer needed, which resulted in the access and exfiltration of Plaintiff's and the Class's Private Information.

54.    The perpetrator of the Data Breach accessed and acquired files in Defendants' computer systems containing unencrypted Private Information of Plaintiff and Class Members, including their names, dates of birth, Social Security numbers, PHI, and other sensitive information.

55.    Upon information and belief, the unauthorized third-party cybercriminal(s) gained access to the Private Information and engaged in (and will continue to engage in) misuse of the Private Information, including marketing and selling Plaintiff's and Class

---

[20] https://www.govinfosecurity.com/medusa-ransomware-hack-pathology-lab-affects-18-million-a-26695.
[21] https://www.summitpathology.com/notice-of-data-breach/.

Members' Private Information on the dark web.

56.    Plaintiff believes that her Private Information and that of Class Members was or will be sold on the dark web, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

57.    Plaintiff and Class Members' Private Information was provided to Defendants with the reasonable expectation and mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access.

58.    Accordingly, Defendants had obligations created by HIPAA, reasonable industry standards, common law, statutory law, and their own assurances and representations to keep Plaintiff's and Class Members' Private Information confidential and to protect such Private Information from unauthorized access.

59.    Nevertheless, Defendants failed to spend sufficient resources on preventing external access, detecting outside infiltration, and training their employees to identify threats and defend against them.

60.    The stolen Private Information at issue has great value to the hackers, due to the large number of individuals affected and the fact that health insurance information and Social Security numbers were part of the data that was compromised.

**C. Plaintiff's Individual Experience.**

*Plaintiff Pugliese's Experience*

61.    Plaintiff Pugliese received a Notice of Data Breach Letter from Defendants dated October 18, 2024, informing her that her Private Information was compromised in

the Data Breach.[22]

62.     Defendants were in possession of Plaintiff Pugliese's Private Information before, during, and after the Data Breach.

63.     Because of the Data Breach, Plaintiff Pugliese's highly confidential Private Information is in the hands of cybercriminals. As such, Plaintiff Pugliese and the Class are at an imminent risk of identity theft and fraud.

64.     As a result of the Data Breach, Plaintiff Pugliese has already expended hours of her time and has suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the present and future consequences of the Data Breach, including investigating the Data Breach, investigating how best to ensure that she is protected from identity theft, and reviewing account statements and other information.

65.     Plaintiff Pugliese has already experienced misuse of her Private Information because of the Data Breach. After the Breach, Plaintiff Pugliese discovered numerous unauthorized hard inquiries on her credit report.

66.     Plaintiff Pugliese places significant value in the security of her Private Information and does not readily disclose it. Plaintiff Pugliese has never knowingly transmitted unencrypted Private Information over the internet or any other unsecured source.

67.     Plaintiff Pugliese has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such a

---

[22] Ex. 1.

risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Private Information compromised by the Data Breach. Indeed, Defendants acknowledged the increased risk of future harm Plaintiff Pugliese, and the Class now face by offering complimentary credit monitoring services to Plaintiff Pugliese and the Class.

68.    Knowing that thieves intentionally targeted and stole her Private Information and knowing that her Private Information is in the hands of cybercriminals has caused Plaintiff Pugliese great anxiety beyond mere worry. Specifically, Plaintiff Pugliese has lost hours of sleep, is in a constant state of stress, is very frustrated, and is in a state of persistent worry now that her Private Information has been stolen.

69.    Plaintiff Pugliese has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in the possession of Defendants, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff's and the Class's Private Information will be wholly unprotected and at-risk of future data breaches.

70.    Plaintiff Pugliese has suffered injuries directly and proximately caused by the Data Breach, including: (i) theft of her valuable Private Information; (ii) invasion of privacy and the imminent and certain impending injury flowing from anticipated fraud and identity theft posed by her Private Information being placed in the hands of cybercriminals; (iii) damages to and diminution in value of her Private Information that was entrusted to Defendants for the sole purpose of obtaining services with the understanding that Defendants would safeguard this information against disclosure; (iv) loss of the benefit of the bargain with Defendants to provide adequate and reasonable data security—*i.e.*, the

difference in value between what Plaintiff Pugliese should have received from Defendants and Defendants' defective and deficient performance of that obligation by failing to provide reasonable and adequate data security and failing to protect her Private Information; and (v) continued risk to her Private Information, which remains in the possession of Defendants and which is subject to further breaches so long as Defendants fails to undertake appropriate and adequate measures to protect the Private Information that was entrusted to Defendants.

### D. Defendants had an Obligation to Protect Private Information Under the Law and the Applicable Standard of Care.

71.    Upon information and belief, Defendants are covered by HIPAA (45 C.F.R. § 160.102). As such, it is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

72.    HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information, including health information that is kept or transferred in electronic form.

73.    HIPAA requires Defendants to "comply with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

74.    "Electronic protected health information" is "individually identifiable health information … that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

75.    HIPAA's Security Rule requires Defendants to do the following:

a.    Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b.    Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c.    Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d.    Ensure compliance by their workforce.

101.    HIPAA also requires Defendants to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e).

102.    Additionally, HIPAA requires Defendants to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

103.    The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, further requires Defendants to provide notice of the Data Breach to each affected individual

"without unreasonable delay and in no case later than 60 days following discovery of the breach."

104.    Defendants did not comply with the HIPAA Breach Notification Rule.

105.    Defendants were also prohibited by the Federal Trade Commission Act (the "FTC Act") (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission (the "FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

106.    Defendants were further required by various states' laws and regulations to protect Plaintiff's and Class Members' Private Information.

107.    Defendants owed a duty to Plaintiff and the Class to design, maintain, and test their computer and email systems to ensure that the Private Information in their possession was adequately secured and protected.

108.    Defendants owed a duty to Plaintiff and the Class to create and implement reasonable data security practices and procedures to protect the Private Information in their possession, including adequately training their employees (and others who accessed Private Information within their computer systems) on how to adequately protect Private Information.

109.    Defendants owed a duty to Plaintiff and the Class to implement processes that would detect a breach on their data security systems in a timely manner.

110.    Defendants owed a duty to Plaintiff and the Class to act upon data security warnings and alerts in a timely fashion.

111.    Defendants owed a duty to Plaintiff and the Class to adequately train and supervise their employees to identify and avoid any phishing emails that make it past their email filtering service.

112.    Defendants owed a duty to Plaintiff and the Class to disclose if their computer systems, software, and data security practices were inadequate to safeguard individuals' Private Information from theft because such an inadequacy would be a material fact in the decision to entrust Private Information with Defendants.

113.    Defendants owed a duty to Plaintiff and the Class to disclose in a timely and accurate manner when data breaches occurred.

114.    Defendants owed a duty of care to Plaintiff and the Class because they were foreseeable and probable victims of any inadequate data security practices.

**E.  Defendants were on Notice of Cyberattack Threats and of the Inadequacy of their Data Security.**

115.    Defendants were on notice that companies, including companies operating within and aiding the healthcare industry have been targets for cyberattacks.

116.    Defendants was on notice that the FBI has recently been concerned about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors

targeting healthcare related systems, perhaps for the purpose of obtaining the Protected

Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[23]

117.    The American Medical Association ("AMA") has also warned companies

about the importance of protecting patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue.
> AMA research has revealed that 83% of physicians work in a practice
> that has experienced some kind of cyberattack. Unfortunately, practices
> are learning that cyberattacks not only threaten the privacy and security
> of patients' health and financial information, but also patient access to
> care.[24]

118.    Defendants were also on notice of the importance of data encryption of

Private Information. Defendants knew they kept Private Information in their software and

systems, yet it appears Defendants did not encrypt their software and systems, nor the

information contained within them.

119.    The United States Department of Health and Human Services' Office for

Civil Rights urges the use of encryption of data containing sensitive personal information.

As long ago as 2014, the Department fined two healthcare companies approximately two

million dollars for failing to encrypt laptops containing sensitive personal information. In

announcing the fines, Susan McAndrew, the DSummit's Office of Human Rights' deputy

---

[23] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, REUTERS
(Aug. 2014), http://www.reuters.com/article/2014/08/20/us-cybersecurity-healthcare-fbi-
idUSKBN0GK24U20140820.

[24] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, AM.
MED.    ASS'N    (Oct.    4,    2019),    https://www.ama-assn.org/practice-
management/sustainability/cybersecurity-ransomeware-attacks-shut-down-clinics-
hospitals.

director of health information privacy, stated "[o]ur message to these organizations is simple: encryption is your best defense against these incidents."[25]

120.    As a company operating within the healthcare sector, and a covered entity or business associate under HIPAA, Defendants should have known about their data security weaknesses and sought better protection for the Private Information maintained on their systems and accumulating in their email accounts and software.

### F. Cybercriminals Will Use Plaintiff's and Class Members' Private Information to Defraud Them.

121.    Plaintiff and Class Members' Private Information is of great value to hackers and cybercriminals, and the data stolen in the Data Breach will be used in a variety of sordid ways for criminals to exploit Plaintiff and Class Members and to profit off their misfortune.

122.    Each year, identity theft causes tens of billions of dollars of losses to victims in the United States.[26] For example, with the Private Information stolen in the Data Breach, including Social Security numbers, identity thieves can open financial accounts, apply for credit, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal

---

[25]"Stolen Laptops Lead to Important HIPAA Settlements," U.S. Dep't of Health and Human Services (Apr. 22, 2014), available at https://wayback.archive-it.org/3926/20170127085330/https://www.hhs.gov/about/news/2014/04/22/stolen-laptops-lead-to-important-hipaa-settlements.html.
[26]"Facts + Statistics: Identity Theft and Cybercrime," Insurance Info. Inst., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (discussing Javelin Strategy & Research's report "2018 Identity Fraud: Fraud Enters a New Era of Complexity").

government benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft.[27] These criminal activities have and will result in devastating financial and personal losses to Plaintiff and Class Members.

123.    Private Information is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it and trade the information on the cyber black-market for years.[28]

124.    For example, it is believed that certain Private Information compromised in the 2017 Experian data breach was being used, three years later, by identity thieves to apply for COVID-19-related benefits in the state of Oklahoma.[29]

125.    This was a financially motivated Data Breach. "Once the attacker gains access to the target system, they proceed to encrypt valuable information, such as personal details, credit card information, or account credentials, which can fetch them monetary rewards…After encrypting the data, the threat actors demand a ransom to release the private key required for decryption. Ransoms are typically demanded in cryptocurrencies like Bitcoin or Ethereum, offering a degree of anonymity to the attackers. It is important to

---

[27]*See, e.g.*, Christine DiGangi, *5 Ways an Identity Thief Can Use Your Social Security Number*, Nov. 2, 2017, https://blog.credit.com/2017/11/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/.

[28] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO, July 5, 2007, https://www.gao.gov/assets/270/262904.htmlu.

[29] *See* https://www.engadget.com/stolen-data-used-for-unemployment-fraud-ring-174618050.html; *see also* https://www.wired.com/story/nigerian-scammers-unemployment-system-scattered-canary/.

note that paying the ransom does not guarantee the release of the private key, and there is no guarantee that the cycle of attacks and ransom demands will cease."[30]

126.    To date, there is no indication that Defendants have made any attempt to recover Plaintiff's and Class Members' Private Information.

127.    The only reason cybercriminals go through the trouble of hacking companies like Summit is to steal the highly sensitive information they maintain, which can be exploited and sold for use in the kinds of criminal activity described herein.

128.    The Private Information exposed in this Data Breach is valuable to identity thieves for use in the kinds of criminal activity described herein.

129.    These risks are both certainly impending and substantial. As the FTC has reported, if hackers get access to personally identifiable information, ***they will use it***.[31]

130.    Hackers may not use the accessed information right away. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[32]

---

[30] https://www.encryptionconsulting.com/understanding-how-cybercriminals-hold-your-data-hostage/#:~:text=Modern%20ransomware%20employs%20hybrid%20encryption,private%20key%20required%20for%20decryption.

[31] Ari Lazarus, *How fast will identity thieves use stolen info?*, FED. TRADE COMM'N (May 24, 2017), https://www.consumer.ftc.gov/blog/2017/05/how-fast-will-identity-thieves-use-stolen-info.

[32] *See Cases Currently Under Investigation,* U.S. DEP'T OF HEALTH & HUMAN SERVS.: BREACH PORTAL, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf.

131.    Medical-related identity theft is one of the most common, most expensive, and most difficult to prevent forms of identity theft. According to Kaiser Health News, "medical-related identity theft accounted for 43 percent of all identity thefts reported in the United States in 2013…," which is more than identity thefts involving banking and finance, the government and the military, or education.[33]

132.    As indicated by James Trainor, second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place."[34] A complete identity theft kit that includes health insurance credentials may be worth up to $1,000 on the black market.[35]

133.    When cybercriminals manage to steal health insurance information and other personally sensitive data—as they did here—there is no limit to the amount of fraud to which Plaintiff and Class Members are exposed.

134.    "Hackers want stolen medical records to commit identity theft, use the stolen data as a ransom, sell it on the dark web or impersonate the victim to receive medical services. Medical records are valuable to cybercriminals as they allow cybercriminals to

---

[33] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, https://khn.org/news/rise-of-indentity-theft/.

[34] IDExperts, *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows*, https://www.idexpertscorp.com/knowedge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.

[35] *Managing cyber risks in an interconnected world*, PRICEWATERHOUSECOOPERS: Key findings from The Global State of Information Security Survey 2015, https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf.

commit fraud and go undetected longer than they can with other Personally Identifiable Information[.]"[36]

135.    "Unlike credit cards or login credentials, medical records have a long lifespan and cannot be easily altered making them valuable to cybercriminals. Stolen medical records are difficult for people to identify malicious activity with and allow cybercriminals to misuse them for longer periods undetected. Here are the ways cybercriminals use stolen medical records."[37]

136.    "Healthcare records are so valuable because they can be used to commit a multitude of crimes. Social Security numbers, dates of birth, and demographic data can be used to commit identity theft to obtain loans and credit cards in victims' names. Healthcare data can be used to impersonate patients to obtain expensive medical services, Medicare and Medicaid benefits, healthcare devices, and prescription medications. Healthcare records also contain the necessary information to allow fraudulent tax returns to be filed to obtain rebates."[38]

137.    "ID theft victims often have to spend money to fix problems related to having their data stolen, which averages $600 according to the FTC. But security research firm Ponemon Institute found that health care identity theft victims spend nearly $13,500

---

[36]    https://www.keepersecurity.com/blog/2024/01/11/why-do-hackers-want-medical-records/#:~:text=Cybercriminals%20can%20commit%20crimes%20such,medical%20services%2C%20benefits%20and%20medications.

[37] *Id.*; https://www.hipaajournal.com/why-do-criminals-target-medical-records/.

[38] https://www.hipaajournal.com/why-do-criminals-target-medical-records/.

dealing with their hassles, which can include the cost of paying off fraudulent medical bills."[39]

138.    As described above, identity theft victims must spend countless hours and large amounts of money repairing the impact to their credit.[40]

139.    With this Data Breach, identity thieves have already started to prey on the victims, and one can reasonably anticipate this will continue.

140.    Victims of the Data Breach, like Plaintiff and other Class Members, must spend many hours and large amounts of money protecting themselves from the current and future negative impacts to their credit because of the Data Breach.[41]

141.    In fact, as a direct and proximate result of the Data Breach, Plaintiff and the Class have suffered, and have been placed at an imminent, immediate, and continuing increased risk of suffering, harm from fraud and identity theft. Plaintiff and the Class must now take the time and effort and spend the money to mitigate the actual and potential impact of the Data Breach on their everyday lives, including purchasing identity theft and credit monitoring services, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, healthcare providers, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts, credit reports, and health insurance account information for unauthorized activity for years to come.

---

[39] https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/.
[40] "Guide for Assisting Identity Theft Victims," Federal Trade Commission, 4 (Sept. 2013), http://www.consumer.ftc.gov/articles/pdf-0119-guide-assisting-id-theft-victims.pdf.
[41] "Guide for Assisting Identity Theft Victims," Federal Trade Commission, 4 (Sept. 2013), http://www.consumer.ftc.gov/articles/pdf-0119-guide-assisting-id-theft-victims.pdf.

142.   Plaintiff and the Class have suffered, and continue to suffer, actual harms for which they are entitled to compensation, including:

e.   Trespass, damage to, and theft of their personal property including Private Information;

f.   Improper disclosure of their Private Information;

g.   The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their Private Information being placed in the hands of criminals and having been already misused;

h.   The imminent and certainly impending risk of having their Private Information used against them by spam callers to defraud them;

i.   Damages flowing from Defendants' untimely and inadequate notification of the data breach;

j.   Loss of privacy suffered as a result of the Data Breach;

k.   Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the data breach;

l.   Ascertainable losses in the form of deprivation of the value of patients' personal information for which there is a well-established and quantifiable national and international market;

m.   The loss of use of and access to their credit, accounts, and/or funds;

n.   Damage to their credit due to fraudulent use of their Private Information; and/or

      o.    Increased cost of borrowing, insurance, deposits, and other items which are adversely affected by a reduced credit score.

143.    Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which remains in the possession of Defendants, is protected from further breaches by the implementation of industry standard and statutorily compliant security measures and safeguards. Defendants have shown themselves to be incapable of protecting Plaintiff's and Class Members' Private Information.

144.    Plaintiff and Class Members are desperately trying to mitigate the damage that Defendants have caused them but, given the Private Information Defendants made accessible to cybercriminals, they are certain to incur additional damages. Because identity thieves have their Private Information, Plaintiff and all Class Members will need to have identity theft monitoring protection for the rest of their lives. Some may even need to go through the long and arduous process of getting a new Social Security number, with all the loss of credit and employment difficulties that come with this change.[42]

145.    None of this should have happened. The Data Breach was entirely preventable.

**G. Summit Could Have Prevented the Data Breach but Failed to Adequately Protect Plaintiff's and Class Members' Private Information.**

---

[42] *Will a New Social Security Number Affect Your Credit?*, LEXINGTON LAW (Nov. 16, 2015), https://www.lexingtonlaw.com/blog/credit-101/will-a-new-social-security-number-affect-your-credit.html.

146.    Data breaches are preventable.[43] As Lucy Thompson wrote in the DATA
BREACH AND ENCRYPTION HANDBOOK, "[i]n almost all cases, the data breaches that
occurred could have been prevented by proper planning and the correct design and
implementation of appropriate security solutions."[44] she added that "[o]rganizations that
collect, use, store, and share sensitive personal data must accept responsibility for
protecting the information and ensuring that it is not compromised . . . ."[45]

147.    "Most of the reported data breaches are a result of lax security and the failure
to create or enforce appropriate security policies, rules, and procedures … Appropriate
information security controls, including encryption, must be implemented and enforced in
a rigorous and disciplined manner so that a *data breach never occurs*."[46]

148.    The FTC has promulgated numerous guides for businesses which highlight
the importance of implementing reasonable data security practices. According to the FTC,
the need for data security should be factored into all business decision-making.

149.    In 2016, the FTC updated its publication, *Protecting Private Information: A
Guide for Business*, which established cyber-security guidelines for businesses. The
guidelines note that businesses should protect the personal customer information that they
keep; properly dispose of personal information that is no longer needed; encrypt
information stored on computer networks; understand their network's vulnerabilities; and

---

[43]Lucy L. Thompson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in*
DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012).
[44]*Id.* at 17.
[45]*Id.* at 28.
[46]*Id.*

implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[47]

150.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

151.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

152.    These FTC enforcement actions include actions against healthcare providers and partners like Defendants. *See, e.g., In the Matter of Labmd, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he

---

[47] *Protecting Private Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

153.    Defendants failed to properly implement basic data security practices, including those set forth by the FTC.

154.    Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to customers' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

155.    Defendants also failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

156.    Defendants required Plaintiff and Class Members to surrender their Private Information—including but not limited to their names, addresses, Social Security numbers, medical information, and health insurance information—and were entrusted with properly holding, safeguarding, and protecting against unlawful disclosure of such Private Information.

157.    Many failures laid the groundwork for the success ("success" from a cybercriminal's viewpoint) of the Data Breach, starting with Defendants' failure to incur the costs necessary to implement adequate and reasonable cyber security procedures and protocols necessary to protect Plaintiff's and Class Members' Private Information.

158.    Defendants were at all times fully aware of their obligation to protect the Private Information of Plaintiff and Class Members. Defendants were also aware of the significant repercussions that would result from their failure to do so.

159.    Defendants maintained Plaintiff's and the Class's Private Information in a reckless manner. In particular, their Private Information was maintained and/or exchanged, unencrypted, in Defendants' systems and software which were maintained in a condition vulnerable to cyberattacks.

160.    Defendants knew, or reasonably should have known, of the importance of safeguarding Private Information and of the foreseeable consequences that would occur if Plaintiff's and Class Members' Private Information was stolen, including the significant costs that would be placed on Plaintiff and Class Members as a result of a breach.

161.    The mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Defendants, and thus Defendants were on notice that failing to take necessary steps to secure Plaintiff's and Class Members' Private Information from those risks left that information in a dangerous condition.

162.    Defendants disregarded the rights of Plaintiff and Class Members by, *inter alia*, (i) intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure that their systems and software were protected against unauthorized intrusions; (ii) failing to disclose that it did not have adequately robust security protocols and training practices in place to adequately safeguard Plaintiff's and Class Members' Private Information; (iii) failing to take standard and reasonably available

steps to prevent the Data Breach; (iv) concealing the existence and extent of the Data

Breach for an unreasonable duration of time; and (v) failing to provide Plaintiff and Class

Members prompt and accurate notice of the Data Breach.

## V.    CLASS ACTION ALLEGATIONS

163.    Plaintiff incorporates by reference all allegations of the preceding paragraphs

as though fully set forth herein.

164.    Plaintiff brings all claims as class claims under Fed. R. Civ. P. ("Rule") 23.

Plaintiff asserts all claims on behalf of the Nationwide Class, defined as follows:

**Nationwide Class**

All persons residing in the United States who were sent a Notice of
Data Breach letter from Defendants or on Defendants' behalf.

165.    Plaintiff reserves the right to amend the above definition(s) or to propose

alternative or add subclasses in subsequent pleadings and motions for class certification.

166.    **Numerosity:** The proposed Class is believed to be so numerous that the

joinder of all members is impracticable. The proposed Subclass is also believed to be so

numerous that joinder of all members would be impractical because it is comprised of over

one million individuals.

167.    **Typicality:** Plaintiff's claims are typical of the claims of the Class. Plaintiff

and all members of the Class were injured through Defendants' uniform misconduct. The

same event and conduct that gave rise to Plaintiff's claims are identical to those that give

rise to the claims of every other Class Member because Plaintiff and each member of the

Class had their sensitive Private Information compromised in the same way by the same conduct of Defendants.

168.  **Adequacy:** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class she seeks to represent; Plaintiff has retained counsel competent and highly experienced in data breach class action litigation; and Plaintiff and Plaintiff's counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and her counsel.

169.  **Superiority:** A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiff and the Class. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult, if not impossible, for members of the Class individually to effectively redress Defendants' wrongdoing. Even if Class Members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

170.  **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiff and other members of the Class, and those questions

predominate over any questions that may affect individual members of the Class. Common

questions for the Class include:

a.    Whether Defendants engaged in the wrongful conduct alleged herein;

b.    Whether Defendants failed to adequately safeguard Plaintiff's and the

Class's Private Information;

c.    Whether Defendants' computer systems, software, and data security

practices used to protect Plaintiff's and Class Members' Private

Information violated the FTC Act, HIPAA, and/or state laws and/or

Defendants' other duties discussed herein;

d.    Whether Defendants owed a duty to Plaintiff and the Class to

adequately protect their Private Information, and whether it breached

this duty;

e.    Whether Defendants knew or should have known that their computer

and network security systems and business email accounts were

vulnerable to a data breach;

f.    Whether Defendants' conduct, including their failure to act, resulted

in or was the proximate cause of the Data Breach;

g.    Whether Defendants breached contractual duties owed to Plaintiff and

the Class to use reasonable care in protecting their Private

Information;

h.    Whether Defendants failed to adequately respond to the Data Breach,

including failing to investigate it diligently and notify affected

individuals in the most expedient time possible and without

unreasonable delay, and whether this caused damages to Plaintiff and

the Class;

i.   Whether Defendants continue to breach duties to Plaintiff and the

Class;

j.   Whether Plaintiff and the Class suffered injury as a proximate result

of Defendants' negligent actions or failures to act;

k.   Whether Plaintiff and the Class are entitled to recover damages,

equitable relief, and other relief;

l.   Whether injunctive relief is appropriate and, if so, what injunctive

relief is necessary to redress the imminent and currently ongoing harm

faced by Plaintiff and members of the Class and the general public;

m.   Whether Defendants' actions alleged herein constitute gross

negligence; and

n.   Whether Plaintiff and Class Members are entitled to punitive

damages.

## VI.    <u>CAUSES OF ACTION</u>

### COUNT ONE
### NEGLIGENCE
### <u>(On Behalf of Plaintiff and the Nationwide Class)</u>

171.   Plaintiff incorporates by reference the allegations in paragraphs 1–170 as

though fully set forth herein.

172.    Defendants solicited, gathered, and stored the Private Information of Plaintiff and the Class as part of the operation of their business.

173.    Upon accepting and storing the Private Information of Plaintiff and Class Members, Defendants undertook and owed a duty to Plaintiff and Class Members to exercise reasonable care to secure and safeguard that information and to use secure methods and to implement necessary data security protocols and employee training to do so.

174.    Defendants had full knowledge of the sensitivity of the Private Information, the types of harm that Plaintiff and Class Members could and would suffer if the Private Information were wrongfully disclosed, and the importance of adequate security.

175.    Plaintiff and Class Members were the foreseeable victims of any inadequate safety and security practices. Plaintiff and the Class Members had no ability to protect their Private Information that was in Defendants' possession. As such, a special relationship existed between Defendants and Plaintiff and the Class.

176.    Defendants owed Plaintiff and Class Members a common law duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiff and the Class when obtaining, storing, using, and managing their Private Information, including taking action to reasonably safeguard such data and providing notification to Plaintiff and the Class Members of any breach in a timely manner so that appropriate action could be taken to minimize losses.

177.    Defendants' duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations

where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. See Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

178.    Defendants had duties to protect and safeguard the Private Information of Plaintiff and the Class from being vulnerable to compromise by taking common-sense precautions when dealing with sensitive Private Information. Additional duties that Defendants owed Plaintiff, and the Class include:

a)  To exercise reasonable care in designing, implementing, maintaining, monitoring, and testing Defendants' networks, systems, protocols, policies, procedures, and practices to ensure that Plaintiff's and Class Members' Private Information was adequately secured from impermissible release, disclosure, and publication;

b)  To protect Plaintiff's and Class Members' Private Information in their possession by using reasonable and adequate security procedures and systems; and

c)  To promptly notify Plaintiff and Class Members of any breach, security incident, unauthorized disclosure, or intrusion that affected or may have affected their Private Information.

179.    Only Defendants were in a position to ensure that their systems and protocols were sufficient to protect the Private Information that had been entrusted to them.

180.    Defendants breached their duties of care by failing to adequately protect Plaintiff's and Class Members' Private Information. Defendants breached their duties by, among other things:

a)  Failing to exercise reasonable care in obtaining, retaining, securing, safeguarding, protecting, and deleting the Private Information in their possession;

b)  Failing to protect the Private Information in their possession using reasonable and adequate security procedures and systems;

c)  Failing to train their employees as to how to detect and avoid phishing emails;

d)  Failing to adequately and properly audit, test, and train their employees regarding how to properly and securely transmit and store Private Information;

e)  Failing to adequately train their employees to not store unencrypted Private Information in their personal files longer than absolutely necessary for the specific purpose that it was sent or received;

f)  Failing to consistently enforce security policies aimed at protecting Plaintiff's and the Class's Private Information;

g)  Failing to mitigate the harm caused to Plaintiff and the Class Members;

h) Failing to implement processes to quickly detect data breaches, security incidents, or intrusions; and

i) Failing to promptly notify Plaintiff and Class Members of the Data Breach that affected their Private Information.

181. Defendants' willful failure to abide by these duties was wrongful, reckless, and grossly negligent in light of the foreseeable risks and known threats.

182. As a proximate and foreseeable result of Defendants' grossly negligent conduct, Plaintiff and the Class have suffered damages and are at imminent risk of additional harms and damages (as alleged above).

183. Through Defendants' acts and omissions described herein, including but not limited to Defendants' failure to protect the Private Information of Plaintiff and Class Members from being stolen and misused, Defendants unlawfully breached their duty to use reasonable care to adequately protect and secure the Private Information of Plaintiff and Class Members while it was within Defendants' possession and control.

184. Further, through their failure to provide timely and clear notification of the Data Breach to Plaintiff and Class Members, Defendants prevented Plaintiff and Class Members from taking meaningful, proactive steps to securing their Private Information and mitigating damages.

185. As a result of the Data Breach, Plaintiff and Class Members have spent time, effort, and money to mitigate the actual and potential impact of the Data Breach on their lives, including but not limited to, paying for spyware removal, responding to the

fraudulent use of the Private Information, and closely reviewing and monitoring bank accounts, credit reports, and statements sent from providers and their insurance companies.

186. Defendants' wrongful actions, inaction, and omissions constituted (and continue to constitute) common law negligence.

187. The damages Plaintiff and the Class have suffered (as alleged above) and will suffer were and are the direct and proximate result of Defendants' grossly negligent conduct.

188. Plaintiff and the Class have suffered injury and are entitled to actual and punitive damages in amounts to be proven at trial.

## COUNT TWO
## NEGLIGENCE PER SE
## (On Behalf of Plaintiff and the Nationwide Class)

189. Plaintiff incorporates by reference the allegations in paragraphs 1–170 as though fully set forth herein.

190. Pursuant to the FTC Act, 15 U.S.C. § 45(a), Defendants had a duty to Plaintiff and the Class to provide fair and adequate computer systems and data security to safeguard the Private Information of Plaintiff and the Class.

191. Defendants are covered entities under HIPAA, 45 C.F.R. §160.102, and as such is required to comply with the HIPAA's Privacy Rule and Security Rule. HIPAA requires Defendants to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R.

§ 164.530(c)(1). The confidential data at issue in this case constitutes "protected health information" within the meaning of HIPAA.

192.    HIPAA further requires Defendants to disclose the unauthorized access and theft of the protected health information of Plaintiff and the Class "without unreasonable delay" so that Plaintiff and Class Members could take appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuse of their personal information. *See* 45 C.F.R. §§ 164.404, 164.406, and 164.410.

193.    The FTC Act prohibits "unfair practices in or affecting commerce," including, as interpreted, and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also formed part of the basis of Defendants' duty in this regard.

194.    Defendants gathered and stored the Private Information of Plaintiff and the Class as part of their business which affect commerce.

195.    Defendants violated the FTC Act by failing to use reasonable measures to protect the Private Information of Plaintiff and the Class and by not complying with applicable industry standards, as described herein.

196.    Defendants breached their duties to Plaintiff and the Class under the FTC Act and HIPAA by failing to provide fair, reasonable, or adequate computer systems and/or data security practices to safeguard Plaintiff's and Class Members' Private Information, and by failing to provide prompt notice without reasonable delay.

197.    Defendants' multiple failures to comply with applicable laws and regulations constitutes negligence *per se*.

198.    Plaintiff and the Class are within the class of persons that HIPAA and the FTC Act were intended to protect.

199.    The harm that occurred as a result of the Data Breach is the type of harm HIPAA and the FTC Act were intended to guard against.

200.    Defendants breached their duties to Plaintiff and the Class under these laws by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and the Class's Private Information.

201.    Additionally, Defendants had a duty to promptly notify Plaintiff and the Class of the Data Breach. For instance, HIPAA required Defendants to notify victims of the Breach within 60 days of the discovery of the Data Breach. Defendants did not begin sending Notice of Data Breach Letters to Plaintiff and Class Members until on or around October 2024, despite knowing in April 2024 that unauthorized persons had accessed and/or acquired their Private Information. Plaintiff and Class Members received the Notice of Data Breach Letters after the 60-day period proscribed by HIPAA.

202.    Defendants breached their duties to Plaintiff and the Class by unreasonably delaying and failing to provide notice of the Data Breach expeditiously and/or as soon as practicable to Plaintiff and the Class.

203.    Defendants' violation of the FTC Act and HIPAA constitutes negligence *per se*.

204. As a direct and proximate result of Defendants' negligence *per se*, Plaintiff and the Class have suffered, and continue to suffer, damages arising from the Data Breach, as alleged above.

205. The injury and harm that Plaintiff and Class Members suffered (as alleged above) was the direct and proximate result of Defendants' negligence *per se*.

206. Plaintiff and the Class have suffered injury and are entitled to damages in amounts to be proven at trial.

**COUNT THREE**
**INVASION OF PRIVACY (INTRUSION UPON SECLUSION)**
**(On Behalf of Plaintiff and the Nationwide Class)**

207. Plaintiff incorporates by reference the allegations in paragraphs 1–170 as though fully set forth herein.

208. Plaintiff and Class Members reasonably expected that the sensitive Private Information entrusted to Defendants would be kept private and secure and would not be disclosed to any unauthorized third party or for any improper purpose.

209. Defendants unlawfully invaded the privacy rights of Plaintiff and Class Members by:

    a) Failing to adequately secure their sensitive Private Information from disclosure to unauthorized third parties or for improper purposes;

    b) Enabling the disclosure of personal and sensitive facts and information about them in a manner highly offensive to a reasonable person; and

c) Enabling the disclosure of personal and sensitive facts about them without their informed, voluntary, affirmative, and clear consent.

210.    A reasonable person would find it highly offensive that Defendants, having collected Plaintiff's and Class Members' sensitive Private Information, failed to protect such Private Information from unauthorized disclosure to third parties.

211.    In failing to adequately protect Plaintiff's and Class Members' sensitive Private Information, Defendants acted in reckless disregard of their privacy rights. Defendants knew or should have known that their ineffective security measures, and the foreseeable consequences thereof, are highly offensive to a reasonable person in Plaintiff's and Class Members' position.

212.    Defendants violated Plaintiff's and Class Members' right to privacy under the common law.

213.    Defendants' unlawful invasions of privacy damaged Plaintiff and the Class. As a direct and proximate result of Defendants' unlawful invasion of privacy, Plaintiff and Class Members suffered significant anxiety and distress, and their reasonable expectations of privacy were frustrated and defeated. Plaintiff and the Class seek actual and nominal damages for these invasions of privacy.

**COUNT FOUR**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Nationwide Class)**

214.    Plaintiff incorporates by reference the allegations in paragraphs 1–170 as though fully set forth herein.

215.    Plaintiff and the Class bring this claim in the alternative to all other claims and remedies at law.

216.    Through the use of Defendants' services, Defendants received monetary benefits from Plaintiff and the Class.

217.    Defendants collected, maintained, and stored the Private Information of Plaintiff and Class Members and, as such, Defendants had direct knowledge of the monetary benefits conferred upon it.

218.    Defendants, by way of their affirmative actions and omissions, including their knowing violations of their express or implied contracts with Plaintiff and the Class Members, knowingly and deliberately enriched themselves by saving the costs they reasonably and contractually should have expended on HIPAA compliance and reasonable data privacy and security measures to secure Plaintiff's and Class Members' Private Information.

219.    Instead of providing a reasonable level of security, training, and protocols that would have prevented the Data Breach, as described above and as is common industry practice among companies entrusted with similar Private Information, Defendants, upon information and belief, instead consciously and opportunistically calculated to increase their own profits at the expense of Plaintiff and Class Members.

220.    As a direct and proximate result of Defendants' decision to profit rather than provide adequate data security, Plaintiff and Class Members suffered and continue to suffer actual damages, including (i) the amount of the savings and costs Defendants reasonably and contractually should have expended on data security measures to secure Plaintiff's

Private Information, (ii) time and expenses mitigating harms, (iii) diminished value of Private Information, (iv) loss of privacy, (v) harms as a result of identity theft; and (vi) an increased risk of future identity theft.

221.    Defendants, upon information and belief, have therefore engaged in opportunistic, unethical, and immoral conduct by profiting from conduct that it knew would create a significant and highly likely risk of substantial and certainly impending harm to Plaintiff and the Class in direct violation of Plaintiff's and Class Members' legally protected interests. As such, it would be inequitable, unconscionable, and unlawful to permit Defendants to retain the benefits they derived as a consequence of its wrongful conduct.

222.    Accordingly, Plaintiff and the Class are entitled to relief in the form of restitution and disgorgement of all ill-gotten gains, which should be put into a common fund to be distributed to Plaintiff and the Class.

## COUNT FIVE
## BREACH OF IMPLIED CONTRACT
### (On Behalf of the Nationwide Class)

223.    Plaintiff incorporates by reference the allegations in paragraphs 1–170 as though fully set forth herein.

224.    When Plaintiff and the Class members provided their Private Information to Defendants, they entered into implied contracts in which Defendants agreed to comply with its statutory and common law duties to protect Plaintiff's and Class members' Private Information and to timely notify them in the event of a data breach.

225.    Defendants required Plaintiff and Class members to provide their Private Information in order for them to receive medical related services.

226.    Based on the implicit understanding, Plaintiff and the Class accepted Defendants' offers and provided Defendants with their Private Information.

227.    Plaintiff and Class members would not have provided their Private Information to Defendants had they known that Defendants would not safeguard their Private Information, as promised, or provide timely notice of a data breach.

228.    Plaintiff and Class members fully performed their obligations under their implied contracts with Defendants.

229.    Defendants breached the implied contracts by failing to safeguard Plaintiff's and Class members' Private Information and by failing to provide them with timely and accurate notice of the Data Breach.

230.    The losses and damages Plaintiff and Class members sustained (as described above) were the direct and proximate result of Defendants' breach of their implied contracts with Plaintiff and Class members.

### COUNT SIX
### BREACH OF FIDUCIARY DUTY
### (On Behalf of Plaintiff and the Nationwide Class)

231.    Plaintiff incorporates by reference the allegations in paragraphs 1–170 as though fully set forth herein.

232.    In light of the special relationship between Defendants and Plaintiff and Class Members, whereby Defendants became guardians of Plaintiff's and Class Members' Private Information, Defendants became fiduciaries by undertaking and guardianship of

Plaintiff's and the Class's Private Information, (i) to act primarily for Plaintiff and Class Members, (ii) for the safeguarding of their Private Information; (iii) to timely notify Plaintiff and Class Members of a data breach's occurrence and disclosure; and (iv) to maintain complete and accurate records of what information (and where) Defendants did and do store.

233.    Defendants have a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of Defendants' relationship with its clients' patients, in particular, to keep secure their Private Information.

234.    Defendants have a fiduciary duty to act for the benefit of Plaintiff and Class Members because of the high degree of trust and confidence inherent to the nature of the relationship between Plaintiff and Class Members on the one hand and Defendants on the other, including with respect to their Private Information.

235.    Defendants breached their fiduciary duties to Plaintiff and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period of time.

236.    Defendants breached their fiduciary duties to Plaintiff and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Plaintiff's and Class Members' Private Information.

237.    Defendants breached their fiduciary duties owed to Plaintiff and Class Members by failing to timely notify and/or warn Plaintiff and Class Members of the Data Breach.

238.    Defendants breached their fiduciary duties to Plaintiff and Class Members by otherwise failing to safeguard Plaintiff's and Class Members' Private Information.

239.    As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

## COUNT SEVEN
## DECLARATORY AND INJUNCTIVE RELIEF
### (On Behalf of Plaintiff and the Nationwide Class)

240.    Plaintiff incorporates by reference the allegations in paragraphs 1–170 as though fully set forth herein.

241.    This count is brought under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

242.    As previously alleged, Defendants were required to provide adequate security for the Private Information collected from Plaintiff and the Class.

243.    Defendants owed and still owe a duty of care to Plaintiff and Class Members that require them to adequately secure Plaintiff's and Class Members' Private Information.

244.    Upon reason and belief, Defendants still possessthe Private Information of Plaintiff and the Class Members.

245.    Defendants have not satisfied their contractual obligations and legal duties to Plaintiff and the Class Members.

246.    Since the Data Breach, Defendants have not yet announced any changes to its data security infrastructure, processes, or procedures to fix the vulnerabilities in its computer systems and/or security practices which permitted the Data Breach to occur and go undetected and, thereby, prevent further attacks.

247.    Defendants have not satisfied their contractual obligations and legal duties to Plaintiff and the Class. In fact, now that Defendants' insufficient data security is known to hackers, the Private Information in Defendants' possession is even more vulnerable to cyberattack.

248.    Actual harm has arisen in the wake of the Data Breach regarding Defendants' contractual obligations and duties of care to provide security measures to Plaintiff and the members of the Class. Further, Plaintiff and the members of the Class are at risk of additional or further harm due to the exposure of their Private Information and Defendants' failure to address the security failings that led to such exposure.

249.    There is no reason to believe that Defendants' data security measures are any more adequate now than they were before the Data Breach to meet Defendants' contractual obligations and legal duties.

250.   Plaintiff and the Class, therefore, seek a declaration (i) that Defendants'
existing security measures do not comply with its contractual obligations and duties of care
to provide adequate security, and (ii) that to comply with its contractual obligations and
duties of care, Defendants must implement and maintain reasonable security measures,
including, but not limited to:

   a) Ordering Defendants engage third-party security auditors/penetration testers
      as well as internal security personnel to conduct testing, including simulated
      attacks, penetration tests, and audits on Defendants' systems on a periodic
      basis, and ordering Defendants to promptly correct any problems or issues
      detected by such third-party security auditors;

   b) Ordering Defendants engage third-party security auditors and internal
      personnel to run automated security monitoring;

   c) Ordering Defendants audit, test, and train its security personnel regarding
      any new or modified procedures;

   d) Ordering Defendants segment data by, among other things, creating firewalls
      and access controls so that if one area of Defendants' systems is
      compromised, hackers cannot gain access to other portions of Defendants'
      systems;

   e) Ordering Defendants purge, delete, and destroy, in a reasonably secure
      manner, customer data not necessary for their provisions of services;

   f) Ordering Defendants conduct regular database scanning and security checks;
      and

52

g) Ordering Defendants routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

## VII.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the Class pray for judgment against Defendants as follows:

a.    An order certifying this action as a class action under Rule 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiff is a proper representative of the Class requested herein;

b.    A judgment in favor of Plaintiff and the Class awarding them appropriate monetary relief, including actual damages, restitution, attorney fees, expenses, costs, and such other and further relief as is just and proper.

c.    An order providing injunctive and other equitable relief as necessary to protect the interests of the Class and the general public as requested herein, including, but not limited to:

i.    Ordering that Defendants engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct

any problems or issues detected by such third-party security auditors;

ii.    Ordering that Defendants engage third-party security auditors and internal personnel to run automated security monitoring;

iii.   Ordering that Defendants audit, test, and train their security personnel regarding any new or modified procedures;

iv.    Ordering that Defendants segment customer data by, among other things, creating firewalls and access controls so that if one area of Defendants' systems is compromised, hackers cannot gain access to other portions of Defendants' systems;

v.     Ordering that Defendants cease transmitting Private Information via unencrypted email;

vi.    Ordering that Defendants cease storing Private Information in email accounts;

vii.   Ordering that Defendants purge, delete, and destroy in a reasonably secure manner customer data not necessary for its provisions of services;

viii.  Ordering that Defendants conduct regular database scanning and securing checks;

ix.    Ordering that Defendants routinely and continually conduct internal training and education to inform internal security

personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

x.      Ordering Defendants to meaningfully educate current, former, and prospective employees and subcontractors about the threats faced as a result of the loss of financial and personal information to third parties, as well as the steps they must take to protect against such occurrences;

d.    An order requiring Defendants to pay the costs involved in notifying the Class Members about the judgment and administering the claims process;

e.    A judgment in favor of Plaintiff and the Class awarding them pre-judgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

f.    An award of such other and further relief as this Court may deem just and proper.

## VIII.    **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all appropriate issues raised in this Class Action Complaint.

Date:  November 21, 2024                    Respectfully submitted,

_/s/: William B. Federman_
William B. Federman
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Ave.

Oklahoma City, OK 73120
T: (405) 235-1560
F: (405) 239-2112
E: wbf@federmanlaw.com